# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 11-689V
Filed: April 26, 2013

* * * * * * * * * * * * * * * * *
| | |
|---|---|
| JACOB HENDERLONG, a minor by his next friend, SUSAN HENDERLONG,      * * | UNPUBLISHED |
|      * | Chief Special Master |
| Petitioner,      * | Campbell-Smith |
|      * | |
| v.      * | Dismissal of Claim for |
|      * | Insufficient Proof; Denial Without |
| SECRETARY OF HEALTH      * | a Hearing; Varicella Zoster and |
| AND HUMAN SERVICES,      * | Influenza Vaccines; Alleged |
|      * | Injury of Chronic Inflammatory |
|      * | Demyelinating Polyneuropathy |
| Respondent.      * | (CIDP); Diagnosed Condition of |
|      * | Charcot-Marie-Tooth Disease |
|      * | (CMT). |

* * * * * * * * * * * * * * * * *

Scott W. Rooney, Nemes, Rooney P.C., Farmington Hills, MI, for petitioner.
Julia W. McInerny, Department of Justice, Washington, D.C., for respondent.

## DECISION[1]

### I.    Introduction

On October 18, 2011, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program ("the Program"),[2] alleging that the

---

[1]    Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this decision on the website of the United States Court of Federal Claims, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the entire decision will be available to the public. Id.

varicella zoster and influenza vaccinations that her son Jacob received on November 13, 2008,[3] caused him to suffer a chronic inflammatory demyelinating polyneuropathy (CIDP). Petition at ¶¶ 5, 6, 12. The information in the record, however, does not preponderate in favor of entitlement to a Program award.

To receive compensation under the Program, petitioner must prove either: (1) that Jacob suffered a "Table Injury" – that is, an injury falling within the Vaccine Injury Table – corresponding to one of Jacob's vaccinations, or (2) that Jacob suffered an injury that was in fact caused by an administered vaccine. See §§ 300aa-13(a)(1)(A) and 300aa-11(c)(1). An examination of the record does not uncover any evidence that Jacob suffered a "Table Injury." Further, the record does not contain a medical expert's opinion that is sufficient to prove that Jacob's alleged injury was vaccine-related.

Respondent filed her Rule 4(c) report on March 21, 2013, after petitioner had filed all her medical records and an expert opinion from Dr. Axelrod. Respondent requested dismissal of the petition, asserting petitioner had failed to support a claim for a Table injury as CIDP is not a listed injury for either of the two vaccinations Jacob received. Resp't's Rule 4(c) at 8. Respondent further asserted that petitioner failed to state a prima facie case of causation for an off-Table claim, as she failed to provide sufficient evidence to establish either Althen prongs one or two. Resp't's Rule 4(c) at 7.

Respondent asserted that deficiencies in Dr. Axelrod's expert report render it "unreliable and inadequate to meet petitioner's burden of proof," pointing to medical records indicating that Jacob's possible weakness began in 2006, two years prior to his vaccinations, or in the alternative, that symptoms began in Summer 2009. Id. at 11-12. Finally, respondent observed that Dr. Axelrod's opinion that it was "conceivable" that CIDP symptoms could appear more than 65 days after a triggering event falls "far short" of petitioner's burden to prove that each Althen factor is more likely than not satisfied. Id. at 12-13.

Under the Act, a petitioner may not receive a Program award based solely on the petitioner's claims alone. Rather, the petition must be supported by either medical records or the opinion of a competent physician proving a causal relationship. § 300aa-13(a)(1). In this case, because there are insufficient medical records supporting

---

[2]     The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

[3]     Jacob also received a meningococcus vaccine on Nov. 13, 2008, Pet'r's Ex. 3, however, petitioner alleged no injury as a result of this vaccine.

petitioner's claim, a medical opinion must be offered in support. Petitioner has offered the opinion of Dr. David Axelrod, a clinical immunologist who "ha[s] participated in the diagnosis and treatment of [CIDP] . . . ." [4] Pet'r's Ex. 13 at 1. However, as the undersigned explains in more detail below, Dr. Axelrod's report fails to establish causation under Program standards, and petitioner declined the opportunity to file a supplemental expert report from Dr. Axelrod--notwithstanding the multiple opportunities afforded to do so and after repeated notice that on the current record--petitioner's claim was subject to dismissal for insufficient proof on its face. See Order, ECF Docket No. 36, filed June 28, 2012; Order, ECF Docket No. 38, filed July 27, 2012, at 1; Order, ECF Docket No. 40, filed Dec. 13, 2012, at 2; and Order, ECF Docket No. 45, filed Feb. 5, 2013, at 1.

In light of earlier discussions with counsel during status conferences regarding the need to address the shortcomings in petitioner's expert report, the undersigned construes petitioner's decision not to file a supplemental expert report from Dr. Axelrod, which was communicated in a status report,[5] as a motion for a ruling on the record. As noted in previously issued orders, without more from petitioner, Dr. Axelrod's report is inadequate to meet petitioner's evidentiary burden. See Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). Accordingly, the petition must be **DISMISSED**.

## II.      Factual Background

Petitioner's medical records indicate that Jacob suffered from intermittent weakness, painful headaches and speech issues, well before he received the subject vaccinations. See Pet'r's Ex. 6 at 59, 64; Pet'r's Ex. 12 at 2, 11. In June 2006, Jacob saw his pediatrician, Dr. Mo El-Fouly, with a history of "a lot of headaches." Pet'r's Ex. 12 at 2. In June 2008, Jacob returned to Dr. El-Fouly for a well-child visit, during which it was reported that he had been having headaches, and had speech issues. Id. at 11. Jacob's parents also reported that he exhibited subtle signs of weakness a couple of years before he received the subject vaccinations. Pet'r's Ex. 6 at 64.

On November 13, 2008, Jacob received the vaccines at issue here. On December 11, 2008, four weeks later, Jacob presented to Dr. El-Fouly with complaints of dizziness, shaking legs, and having vomited approximately twelve times that day. Pet'r's Ex. 12 at 12. He also complained of a "severe" headache similar to the type of headache he had experienced roughly six to eight times over the course of several years. Id.

---

[4]      ECF Docket No. 39, filed Sept. 25, 2012.

[5]      Pet'r's Status Report, ECF Docket No. 44, filed Feb. 1, 2013.

Approximately six months later, on June 18, 2009, Jacob was seen by Dr. El-Fouly for a well-child examination.  During the visit, the doctor recorded no raised "concerns or questions."  Pet'r's Ex.12 at 13.  Dr. El-Fouly's visit notes indicate that Jacob was involved in hockey, football, and baseball.  Id.

Three months later, on September 10, 2009, Jacob's parents returned to Dr. El-Fouly with complaints that Jacob had been suffering from a "degradation of motor skills," with Jacob's father reporting that he believed Jacob's "condition ha[d] deteriorated [in the] past two weeks."  Id. at 14.  Detecting low muscle tone (hypotonia) in Jacob's "pelvic girdle," as well as a "gait disturbance," Dr. El-Fouly referred Jacob to Dr. Brian Woodruff, a neurologist, for further evaluation.  Id.

Dr. Woodruff examined Jacob four days later, on September 14, 2009.  Pet'r's Ex.11 at 1.  As reported by both Jacob's parents, Dr. Woodruff noted "[g]eneralized weakness … throughout his 'entire body.' It appears to be a slow process.  He has always been tired with long walks."  Id. Dr. Woodruff ordered an electromyography and nerve conduction study to be performed that day.  The nerve conduction study (NCS) results were "abnormal and consistent" with Charcot-Marie Tooth disease.  Id. at 1, 4.  Charcot-Marie-Tooth disease is "a group of hereditary conditions characterized by chronic motor and sensor polyneuropathy . . . [which presents as] progressive symmetric distal muscle weakness and atrophy starting in the feet and legs, gait disturbance, and absent stretch reflexes."  Dorland's Illustrated Medical Dictionary 530 (32d ed. 2012).  Upon review of the nerve conduction test results, Dr. Woodruff ordered a "genetic CMT complete panel" test, Pet'r's Ex.11 at 1, 12, and referred Jacob for occupational and physical therapy to address his CMT-like symptoms.  Pet'r's Ex. 6 at 110, 119.

The CMT genetic evaluation performed on Jacob was inconclusive.  But the test results informed that Jacob possessed a DNA sequence variant "whose significance [was] unknown," and that "[i]t [was] unknown whether th[is] sequence variant[] m[ight] lead to, or be causative of, CMT."  Pet'r's Ex. 8 at 5, 7.  The genetic testing service observed that "[t]esting of [Jacob's] parents and family members [was] likely to improve the clinical utility of this test result."  Id. at 7.

The next month, Jacob was seen for a physical therapy evaluation and an occupational therapy evaluation at the University of Michigan's Health Center.  Pet'r's Ex. 6 at 59-69.  At both evaluations, Jacob's parents reported--presumably in an earnest effort to obtain treatment for Jacob--that he was functioning typically for his age, until about three years ago.  Id. at 59, 64.  Jacob's father reported that he first noticed weakness in Jacob "approx[imately] 3 years ago."  Id. at 64.  He explained that "at first the weakness was not really that noticeable," but gradually it became more obvious.  Id. Jacob's mother reported that "at the start of the fall [2009] sport season, [Jacob] . . . had to stop actively participating in sports due to safety concerns."  Id. at 59.

4

Both the physical therapist and the occupational therapist identified the onset date for Jacob's illness as "3 years ago." Id. at 59, 64. Jacob's father's report of the first sign of weakness places the onset of Jacob's CIDP in October 2006, nearly two years prior to the vaccinations at issue.

In November 2009, one year after his vaccinations, Jacob consulted with a second neurologist, Dr. Gyula Acsadi; Jacob's parents sought another neurologic opinion because they questioned Dr. Woodruff's diagnostic impression of CMT. Pet'r's Ex. 1 at ¶¶ 19-25; Pet'r's Ex. 2 at ¶¶ 19-25. The Henderlongs reported to Dr. Acsadi that Jacob's "slowly worsening weakness . . . possibly start[ed] in early 2009[,] but . . . wasn't really apparent until th[e] summer" of 2009. Pet'r's Ex. 4 at 3 (emphasis added). Dr. Acsadi diagnosed Jacob with CIDP. Id. at 5, 32. CIDP is "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs . . . ." Dorland's at 1491. Presenting symptoms often include "tingling or numbness of the digits, weakness of the limbs, hyporeflexia[6] or areflexia,[7] fatigue, and abnormal sensations." Id. After receiving the CIDP diagnosis, Jacob continued to receive the same occupational and physical therapy he had begun to receive earlier. Pet'r's Ex. 6 at 2-46.

## III.    Expert Opinion

Persuaded that Jacob had suffered a vaccine-related injury, petitioner filed a vaccine claim and an expert report from Dr. Axelrod, addressing the immunologic mechanism of harm caused by the complement of vaccines given to Jacob. Pet'r's Ex. 13. Dr. Axelrod opined that "it is within a reasonable degree of medical certainty that Jacob Henderlong developed a demyelinating disorder as a result of the vaccinations he received on November 13, 2008." Id. at 4.

In his report, Dr. Axelrod offered an immunologically-based theory regarding how Jacob's vaccinations could have caused his CIDP, positing that Jacob was harmed by circulating immune complexes that mimicked his molecular structure and led to an autoimmune attack (a process referred to as "molecular mimicry"). Id. at 3-4. As evidence of Jacob's vaccine-related harm, Dr. Axelrod asserted that he "suffered progressive weakness from early 2009" based on a report from Jacob's parents contained in the records of Jacob's treating neurologist, Dr. Acsadi Id. at 1.

---

[6]      Hyporeflexia is "dysreflexia characterized by weakening of the reflexes." Dorland's at 905.

[7]      Areflexia is an "absence of reflexes." Dorland's at 130.

Dr. Axelrod asserted that Jacob's "first manifestation of his [CIDP]" occurred around December 11, 2008 (four weeks after his vaccinations) in the form of shaking legs, as was noted in Jacob's pediatric records. Pet'r's Ex. 13 at 1; see Pet'r's Ex. 12 at 12. Dr. Axelrod also pointed to Dr. Acsadi's neurologic evaluation of Jacob in November 2009 to place the onset of Jacob's symptoms in the weeks immediately following his vaccinations.

Jacob's treater, Dr. Acsadi, does not appear to have been aware of Jacob's earlier (and pre-vaccinal) neurologic symptoms of severe headache, speech difficulties, and weakness. Nor does it appear that Jacob's parents addressed those symptoms during their initial office visit with Dr. Ascadi.

Moreover, petitioner's expert, Dr. Axelrod, was silent in his offered expert report regarding the significance of Jacob's neurologic issues -- in particular his weakness -- in the years preceding his vaccination. The reason for Dr. Axelrod's silence is unclear but perhaps is informed by the fact that although he has "participated in" the diagnosis of the neurologic disorder of CIDP, he is not a neurologist and thus defers in his report to the notations and findings made by Jacob's treating neurologist, Dr. Acsadi.

Focused primarily on the symptoms of post-vaccinal weakness that Jacob's parents reported to Dr. Acsadi, Dr. Axelrod asserts in his expert report that "it is conceivable that symptoms [of Jacob's CIDP]" would have occurred more than two months (following "day 65") after Jacob's vaccination. Pet'r's Ex. 13 at 3. Dr. Axelrod added that it is also "conceivable" that the appearance of Jacob's ataxia on September 10, 2009 (301 days after the date of vaccination) could be consistent with an immune-mediated injury precipitated by Jacob's vaccinations. Id. at 1, 3. Dr. Axelrod cited eighteen articles that, in his estimation, supported the proposition that Jacob's vaccinations caused his CIDP. Id. at 4-5.

## IV.    Discussion

Because petitioner's injury is not listed on the Vaccine Injury Table, petitioner cannot establish a Table injury but instead must establish that Jacob's received vaccines caused his alleged injury. See Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1335 (Fed. Cir. 2010). To do so, petitioner must show by preponderant evidence that the vaccines brought about his injury by providing: (1) a medical theory causally connecting the vaccination and the alleged injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between the vaccination and the injury. Althen, 418 F.3d at 1278. Petitioner satisfies the preponderant evidence standard by showing that a proposition is more likely than not. Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010).

6

As addressed below, Dr. Axelrod's report is insufficient on its face to establish Program entitlement. Even if Dr. Axelrod's report offered a "medical theory causally connecting the vaccination and the injury," it fails to satisfy the second and third prongs of the <u>Althen</u> test. Because petitioner has failed to satisfy all three <u>Althen</u> prongs, petitioner cannot establish she is entitled to compensation. <u>See</u> <u>de Bazan v. Sec'y of Health & Human Servs.</u>, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

Whether Jacob's presenting symptoms--which were substantially separated in time--were part of the same neurologic injury is the threshold question in this case, and because timing is the dispositive issue here, undersigned addresses the <u>Althen</u> prongs in reverse order.

## A. <u>Althen</u> Prong Three

Petitioner cannot prevail on her vaccine claim because Dr. Axelrod's report is facially deficient with regards to <u>Althen</u> prong three. Prong three of the <u>Althen</u> test requires petitioner to provide preponderant evidence of "a proximate temporal relationship between [Jacob's] vaccination and [his] injury." <u>Althen</u>, 418 F.3d at 1278; <u>de Bazan</u>, 539 F.3d at 1352-53. Dr. Axelrod's report fails to do so.

Dr. Axelrod posits that both Jacob's post-vaccinal symptom of leg shaking and his much later symptom of gait disturbance were frank symptoms of his evolving CIDP. Pet'r's Ex. 13 at 1. Dr. Axelrod further posits that each of these symptoms resulted from circulating immune complexes that were triggered by Jacob's vaccination. <u>Id.</u> Dr. Axelrod insists that as a general proposition, "it is <u>conceivable</u>" that symptoms of CIDP could develop more than two months (or 65 days) after the triggering immunologic event of vaccination. <u>Id.</u> at 3. The linchpin of Dr. Axelrod's theory is the "conceivable" impact of circulating immune complexes more than nine months after the immunologic trigger of vaccination. "Although the 'preponderant evidence' standard [required under the Program] does not demand scientific certainty, neither is it satisfied by mere speculation." <u>Hennessey v. Sec'y of Health & Human Servs.</u>, 91 Fed. Cl. 126, 133 (2010). As the plain language of Dr. Axelrod's opinion indicates, the term "conceivable" means merely "imaginable." <u>See</u> Definition of Conceivable, <u>Merriam-Webster Dictionary</u>, <u>available at</u> http://www.merriam-webster.com/dictionary/ conceivable (last visited April 23, 2013). As that term is used by Dr. Axelrod, a "conceivable" impact offers petitioner very weak support, at most, for "a proximate temporal relationship between [Jacob's] vaccination and [his] injury." <u>Althen</u>, 418 F.3d at 1278. <u>See also</u> <u>Moberly</u>, 592 F.3d at 1324 ("recognizing that a special master may "require some indicia of reliability to support the assertion of the expert witness.").

The speculative nature of the timing aspect of Dr. Axelrod's opinion is further revealed by the medical literature he references. The cited literature fails to provide the requisite support for his theory, especially the 1984 Lawley article on which Dr. Axelrod

7

most heavily relies.[8]  He relies on that article for the particular proposition that symptoms of CIDP could manifest more than 65 days after vaccination.  Pet'r's Ex. 13 at 2-3.

The authors of the 1984 Lawley article studied and recorded the circulating immune complex levels "in a [r]epresentative [p]atient . . . with [s]erum [s]ickness after [t]reatment with [a]ntithymocyte [g]lobulin (ATG)."  Pet'r's Ex. 16 at 1410.  Dr. Axelrod claims that the authors' findings of "clinical manifestations of disease [that] appeared to relate to the elevated levels of [circulating] immune complexes" furnish support for a finding here that Jacob's vaccinations caused his CIDP.  Pet'r's Ex. 13 at 3.  But, the Lawley article authors' findings provide questionable support, at best, for Dr. Axelrod's hypothesis because the authors recorded immune responses for a period of 65 days only—without extending beyond that time frame.  Id. at 13; see also Pet'r's Ex. 16 at 1410.  Dr. Axelrod's opinion here is based on his own conjecture that the authors' findings in the 1984 Lawley article could apply beyond 65 days.  Because his theory proposing "a proximate temporal relationship between [Jacob's] vaccination and [his] injury" is merely "conceivable," and not more likely than not, Dr. Axelrod's medical opinion does not assist petitioner in meeting her evidentiary burden required under prong three of Althen.  The gap between what is known and what petitioner asks the undersigned to accept is simply too great, Althen, 418 F.3d at 1278; Pet'r's Ex. 13 at 3, and without the requisite element of timing, petitioner's claim must fail on prong three.

### B.  **Althen Prong Two**

Prong two of the Althen test requires petitioner to show that Jacob reacted to his vaccinations in a manner consistent with Dr. Axelrod's theory.  But the issue of Jacob's symptom onset calls into question the vaccine-relatedness of Jacob's ongoing health conditions.

Dr. Axelrod pointed to Dr. Acsadi's evaluation of Jacob in November 2009 to place the onset of Jacob's symptoms in December 2008 -- less than one month after the vaccination at issue -- when Jacob reported that his legs had been shaking.  Pet'r's Ex. 13 at 1.  But Dr. Axelrod fails to address in his expert report the apparently conflicting aspects of the record regarding the onset of Jacob's neurologic symptoms.  According to several reports from his parents, Jacob's weakness first presented in 2006 (two years before his vaccinations).  He had a instance of leg shaking in December of 2008 (one month after his vaccinations), but according to Jacob's mother's report during a June 2009 well-child visit (seven months after Jacob's vaccinations), there were no expressed concerns about Jacob's health.  The weakness that evolved later during the summer of 2009 progressed to the point of disturbing Jacob's gait.  Very concerned about Jacob's

---

[8]  T.J. Lawley et al., A Prospective Clinical and Immunologic Analysis of Patients with Serum Sickness, 311 New Eng. J. of Med. 1407 (1984).

condition, the Henderlongs sought a neurologic evaluation for Jacob in September of 2009.

As proposed by Dr. Axelrod, the pertinent aspects of the record are the singular instance of post-vaccinal leg shaking followed by--approximately eight months later-- a documented impairment in Jacob's stride. According to Dr. Axelrod, these events conceivably present an appropriate clinical picture of the evolution of a vaccine-precipitated CIDP. Dr. Axelrod's theory of causation is recognizably speculative on this record, and while aware of the shortcomings identified in Dr. Axelrod's report, petitioner repeatedly has declined the opportunity to address Jacob's entire neurologic picture as requested.

Dr. Axelrod's expert report is further weakened by an inadequate discussion of Jacob's CIDP diagnosis. As defined in the 2003 Toyka article Dr. Axelrod cited in his report, CIDP is a "demyelinating disease . . . characterized by relapsing or progressive proximal and distal muscle weakness with possible sensory loss."[9] Pet'r's Ex. 15 at S2. Whether Jacob's CIDP is "relapsing" or "progressive" is not known from the record and is not addressed in Dr. Axelrod's report. Whether petitioner's symptoms manifested in a timeframe and manner consistent with Dr. Axelrod's theory of causation also is unclear from petitioner's expert report because Dr. Axelrod does not adequately describe CIDP, how it manifests, or whether Jacob's complete medical history properly aligns with the neurologic community's understanding of CIDP's clinical features. Rather, he focuses on the immunologic mechanism of vaccine causation without elucidating how Jacob's overall neurologic course implicated a vaccine injury.

Petitioner has failed to address Jacob's medical records as a whole, which describe the appearance (and absence) of Jacob's various neurologic symptoms. Instead, petitioner has offered a carefully circumscribed opinion from Dr. Axelrod that considers only a selective and partial view of the record. Although Dr. Axelrod represented that he had "participated in the diagnosis . . . of [CIDP]," Pet'r's Ex. 13 at 1, he did not discuss in his expert report the relevance (or irrelevance) of a number of Jacob's medical records and documented neurologic symptoms (including weakness) which pre-dated the subject vaccinations. Even with Dr. Axelrod's report, this record on its face does not establish, by preponderant evidence, a logical causal sequence between Jacob's received vaccines and his neurologic problems. Thus, petitioner's claim fails on prong two of Althen.

---

[9]     Klaus V. Toyka & Ralf Gold, The Pathogenesis of CIDP: Rationale for Treatment with Immunomodulatory Agents, 60 Neurology S2 (2003).

### C. **Althen** Prong One

Dr. Axelrod has offered the theory that Jacob's received vaccines led to a circulating immune complex that resulted in his neurologic injury. According to Dr. Axelrod, "[i]mmune reactions to vaccines depend upon the individual's immune system's ability to recognize the vaccine as a foreign substance." Pet'r's Ex. 13 at 3. He opined that Jacob's vaccinations caused an "immune response . . . [that] result[ed] in an unwanted immune response against otherwise normal tissues," Id. at 3, and Jacob's "activated immune system" caused "immune mediated damage" in the form of "demyelinated or thinly myelinated axons." Id. at 2. Dr. Axelrod asserted that this damage ultimately led to Jacob's CIDP. Id. at 4.

Even if the undersigned were to accept Dr. Axelrod's theory of causation in satisfaction of Althen prong one, his report is insufficient on its face, as previously discussed, for petitioner to meet her evidentiary burden under prongs two and three of Althen. Accordingly, petitioner cannot prevail on the record as presented.

### V. Conclusion

Petitioner has not met her evidentiary burden under Althen. Petitioner has declined multiple opportunities to file a supplemental expert report from Dr. Axelrod to address the deficiencies the undersigned has identified in petitioner's expert report. Because petitioner has failed to demonstrate either that Jacob suffered a "Table Injury" or that his injuries were in fact caused by his vaccinations, **this case is dismissed for insufficient proof. The Clerk shall enter judgment accordingly.**

**IT IS SO ORDERED.**

s/ Patricia E. Campbell-Smith
Patricia E. Campbell-Smith
Chief Special Master

10